## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MELBA HARRIS,

     Plaintiff,

                           Case Number: 2:21-cv-11439

vs.

                           Honorable F. Kay Behm

DELTA AIR LINES, INC.,
a Delaware corporation,
                           Magistrate Judge David R. Grand

     Defendant.

---

| | |
|---|---|
| DRIGGERS, SCHULTZ & HERBST | TAFT STETTINIUS & HOLLISTER LLP |
| By: Mark Kelley Schwartz (P48058) | By: Scott Torpey (P36179) |
| Attorney for Plaintiff | Timothy J. O'Connell (P79737) |
| 3331 W. Big Beaver Road, Suite 101 | Attorneys for Defendant |
| Troy, MI 48084 | 27777 Franklin Rd., Suite 2500 |
| Tel: (248) 649-6000 | Southfield, MI 48034 |
| Fax: (248) 649-6442 | (248) 351-3000 |
| MSchwartz@DriggersSchultz.com | storpey@taftlaw.com |
| | toconnell@taftlaw.com |

---

### DEFENDANT DELTA AIR LINES, INC.'S MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56

### ORAL ARGUMENT REQUESTED

Defendant Delta Air Lines Inc. ("Delta") respectfully moves this Court for summary judgment under Fed. R. Civ. P. 56 to dismiss with prejudice the claims of Plaintiff Melba Harris ("Plaintiff"). The facts and law in support of this motion are set forth with particularity in the accompanying memorandum of law, which Delta files in accordance with E.D. Mich. L.R. 7.1(d) and this Court's individual rules. Per E.D. Mich. L.R. 7.1(a), the undersigned states that on April 13, 2023, his colleague,

Timothy J. O'Connell, contacted Plaintiff's counsel by email and by telephone to ascertain whether Plaintiff intends to concur with Delta's motion for summary judgment and explained the substance of Delta's motion. Plaintiff's counsel responded and stated that Plaintiff does not concur in the relief sought, so Delta confirms that it has satisfied its L.R. 7.1(a) obligations.

Accordingly, Delta respectfully requests that the Court enter an order granting summary judgment in favor of Delta and against Plaintiff, dismissing Plaintiff's claims with prejudice as a matter of law, and granting any further legal and equitable relief as this Court deems necessary and proper.

Dated: April 13, 2023

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

By:   /s/Scott R. Torpey
      Scott R. Torpey (P36179)
      Timothy J. O'Connell (P79737)
*Attorneys for Defendant Delta Air Lines, Inc.*
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
(248) 351-3082 (fax)
storpey@taftlaw.com
toconnell@taftlaw.com

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MELBA HARRIS,

     Plaintiff,

                                     Case Number: 2:21-cv-11439

vs.

                                     Honorable F. Kay Behm

DELTA AIR LINES, INC.,
a Delaware corporation,                  Magistrate Judge David R. Grand

     Defendant.

---

| | |
|---|---|
| DRIGGERS, SCHULTZ & HERBST<br>By: Mark Kelley Schwartz (P48058)<br>Attorney for Plaintiff<br>3331 W. Big Beaver Road, Suite 101<br>Troy, MI 48084<br>Tel: (248) 649-6000<br>Fax: (248) 649-6442<br>MSchwartz@DriggersSchultz.com | TAFT STETTINIUS & HOLLISTER LLP<br>By: Scott Torpey (P36179)<br>Timothy J. O'Connell (P79737)<br>Attorneys for Defendant<br>27777 Franklin Rd., Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>storpey@taftlaw.com<br>toconnell@taftlaw.com |

---

## **DEFENDANT DELTA AIR LINES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

## **ORAL ARGUMENT REQUESTED**

## **TABLE OF CONTENTS**

Page

INDEX OF AUTHORITIES.....................................................................iii

STATEMENT OF ISSUE PRESENTED...................................................vi

STATEMENT OF CONTROLLING/MOST APPROPRIATE AUTHORITY
....................................................................................................... vii

INTRODUCTION ...................................................................................1

STATEMENT OF UNDISPUTED FACTS ..............................................1

STANDARD OF REVIEW .....................................................................10

ARGUMENT ........................................................................................11

I.    LIABILITY STANDARDS UNDER ARTICLE 17 OF THE
      MONTREAL CONVENTION.........................................................11

      A.    Plaintiff's Flight on Delta Was "International Carriage" Under
            the Montreal Convention....................................................11

      B.    The Montreal Convention Provides the Exclusive Cause of
            Action for a Bodily Injury Caused by an "Accident" on an
            International Flight. ............................................................12

      C.    Objective Standards, Not a Passenger's Subjective Standard or
            Belief, Determine Whether an Event Is an Article 17 Accident.........15

      D.    Industry Standards and Procedures Determine Usual and
            Expected Operations..........................................................16

      E.    There Are Industry-Standard Temperature Ranges for Brewing
            and Serving Hot Coffee......................................................17

II.   PLAINTIFF   CANNOT   PRESENT   ANY   AFFIRMATIVE
      EVIDENCE OF AN ARTICLE 17 "ACCIDENT," WHICH IS AN
      ESSENTIAL ELEMENT OF PLAINTIFF'S EXCLUSIVE CAUSE
      OF ACTION. ..............................................................................20

A. Plaintiff Cannot Present Any Evidence Showing That the Coffee Served By Delta Was Hotter Than the Standard, Usual, and Expected Range of Temperatures for Hot Coffee..............................20

 1. Plaintiff cannot prove by a preponderance of the evidence that Delta served coffee that was unusually or unexpectedly hot. .....................................................................21

 2. Plaintiff cannot prove by a preponderance of the evidence that her second-degree burn was caused by unusually or unexpectedly hot coffee. ..........................................................23

CONCLUSION ........................................................................................25

# INDEX OF AUTHORITIES

Page(s)

**CASES**

*Air France v. Saks*,
470 U.S. 392, 470 U.S. 392, 105 S.Ct. 1338,
84 L.Ed.2d 289 (1985)..................................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................11

*Avalon Techs., Inc. v. EMO-Trans, Inc.*,
No. 14-14731, 2015 WL 1952287 (E.D. Mich. Apr. 29, 2015).........11

*Barnett v. Leiserv, Inc.*,
968 F. Supp. 690 (N.D. Ga. 1997)....................................................18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................10

*Cohen v. Am. Airlines*, *Inc.*,
13 F.4th 240 (2d Cir. 2021) ..............................................................14

*Dizon v. Asiana Airlines, Inc.*,
240 F. Supp. 3d 1036 (C.D. Cal. 2017)............................................15

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*,
525 U.S. 155, 119 S. Ct. 662 (1999)................................. vii, 14, 20, 24

*Fishman by Fishman v. Delta Air Lines, Inc.*,
132 F.3d 138 (2d Cir. 1998) .............................................................16

*Fulop v. Malev Hungarian Airlines*,
175 F.Supp.2d 651 (S.D.N.Y. 2001) ........................................*passim*

*Fulop v. Malev Hungarian Airlines, Inc.*,
244 F. Supp. 2d 217 (S.D.N.Y. 2003) .........................................16, 17

*Furuta v. Hawaiian Airlines Inc.*,
No. CV 19-00617 JAO-KJM, 2022 WL 3645764 (D. Haw. Aug. 24, 2022) ....13

*Gotz v. Delta Air Lines*,
12 F. Supp. 2d (D. Mass. 1998) ........................................................................... 15

*Greene v. Boddie-Noell Enterprises, Inc.*,
966 F. Supp. 416 (W.D. Va. 1997) ...................................................................... 17

*Holowaty v. McDonald's Corp.*,
10 F. Supp. 2d 1078 (D. Minn. 1998) ........................................................... 17, 18

*Husain v. Olympic Airways*,
116 F. Supp. 2d 1121 (N.D. Cal. 2000) .............................................................. 15

*Immormino v. J & M Powers, Inc.*,
91 Ohio Misc. 2d 198, 698 N.E.2d 516 (Ohio Com. Pl. 1998) .......................... 18

*Jacob v. Korean Air Lines Co.*,
No. 12-CV-62384, 2014 WL 1584444 (S.D. Fla. Mar. 20, 2014) .................... 23

*Krys v. Lufthansa*,
119 F.3d 1515 (11th Cir. 1997) .......................................................................... 15

*Magan v. Lufthansa German Airlines*,
339 F.3d 158 (2d Cir. 2003) ............................................................................... 13

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................................... 10

*McCroy ex rel. McCroy v. Coastal Mart, Inc.*,
207 F. Supp. 2d 1265 (D. Kan. 2002) ................................................................ 19

*McMahon v. Bunn-O-Matic Corp.*,
No. 3:96-CV-538RP, 1997 WL 873829 (N.D. Ind. Nov. 10, 1997) ................. 17

*Moore v. Brit. Airways PLC*,
32 F.4th 110 (1st Cir. 2022) ............................................................................... 15

*Morris v. Starbucks Corp.*,
No. 1:18-CV-5034-TWT, 2019 WL 7496785
(N.D. Ga. Sept. 27, 2019) ....................................................................... 17, 19, 24

*Oubre v. E-Z Serve Corp.*,
713 So. 2d 818 (5th Cir. 1998) ........................................................................... 18

*Rafailov v. El Al Israel Airlines, Ltd.*,
    No. 06 CV 13318 (GBD),
    2008 WL 2047610 (S.D.N.Y. May 13, 2008) ....................................................13

*Sethy v. Malev-Hungarian Airlines, Inc.*,
    No. 98 CIV. 8722 (AGS), 2000 WL 1234660
    (S.D.N.Y. Aug. 31, 2000) ................................................................14, 16, 17, 24

*Siddiq v. Saudi Arabian Airlines Corp.*,
    No. 6:11-CV-69-ORL-19GJK, 2013 WL 2152566
    (M.D. Fla. Jan. 9, 2013) ...................................................................................12

*Sook Jung Lee v. Korean Air Lines Co.*,
    No. SACV 10-01709-JVS, 2012 WL 1076269
    (C.D. Cal. Mar. 21, 2012) .................................................................................16

*Wallace v. Korean Air*,
    214 F.3d 293 (2d Cir. 2000) .............................................................................13

## RULES

Fed. R. Civ. P. 56 ........................................................................... vii, 10, 20

L.R. 7.1(d)(2) ............................................................................................ vii

## <u>STATEMENT OF ISSUE PRESENTED</u>

Whether this Court should grant summary judgment in favor of Delta because Plaintiff cannot satisfy her burden of presenting evidence showing that an injurious event was an "accident" under Article 17 of the Montreal Convention, which provides Plaintiff's exclusive cause of action.

Delta answers:  Yes.

## STATEMENT OF CONTROLLING/MOST APPROPRIATE AUTHORITY

Pursuant to E.D. Mich. L.R. 7.1(d)(2), Delta provides the following as the controlling and/or most appropriate authority for the relief sought.

**Cases**

*Air France v. Saks*, 470 U.S. 392, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 119 S. Ct. 662 (1999)

**Rules**

Fed. R. Civ. P. 56

**Other**

Convention for the Unification of Certain Rules Relating to International Carriage by Air, opened for signature on May 18, 1999, reprinted in S. Treaty Doc. 106-45 at 27 (2000) 1999 WL 33292734 (entered into force November 4, 2003) (treaty), commonly referred to as the "Montreal Convention"

**INTRODUCTION**

Plaintiff Melba Harris ("Plaintiff") claims that a cup of coffee spilled into her lap during an international flight operated by Defendant Delta Air Lines, Inc. ("Delta"). Plaintiff claims the coffee was so hot as to be "unfit for human consumption." However, **Plaintiff does not know the temperature at which the coffee was served**. Instead, Plaintiff merely testified that she did not expect the spilled coffee to burn her skin. Yet the competent evidence shows that **a usual cup of coffee is hot enough to burn skin within seconds**. Moreover, Plaintiff's **subjective** expectation that she would not get burned by spilled coffee does not constitute an "accident" under the Montreal Convention, which provides Plaintiff's exclusive cause of action. Therefore, Delta is entitled to summary judgment.

**STATEMENT OF UNDISPUTED FACTS**

1.     On February 9, 2020, Plaintiff was on board Flight DL276, which was an international flight from Japan to Detroit Metropolitan Wayne County Airport ("DTW"). (PageID.3 ¶9) Flight DL276 was operated by Delta. (PageID.3 ¶¶8-9)

2.     Plaintiff claims that, during the flight, she suffered a second-degree burn on her leg when a cup of coffee spilled from her tray table into her lap. (**Exhibit A:** Harris at 37:12-14, 22-24; 38:16-18; 39:12-14)

3.     The spill and injury occurred on board one of Delta's Airbus A359 aircraft, where the coach-class cabin starts at row 20, and Plaintiff was seated in row

1

44. (**Exhibit B:** Flight DL276 Boarding Pass, HARRIS000053; **Exhibit C:** Individual Flight display, DELTA000110, "Eqp [equipment] [Airbus] 359"; **Exhibit D:** https://www.delta.com/us/en/aircraft/ airbus/a350, Seat Map)

4.      There are several galleys in the coach-class cabin on this aircraft: one galley in front of row 20, and six other galleys at the very back of the aircraft behind row 55. (**Ex. D**) The on-board coffee makers for the coach-class cabin are located in several of these galleys.

5.      As Plaintiff's Complaint properly alleges, Delta is an air carrier engaged in the transportation of passengers. (PageID.2) Delta, however, is not the designer or manufacturer of any aircraft or any aircraft components, including the on-board coffee makers.

6.      According to the Standards and Regulations for Coffee Makers/Water Boilers, which are contained in Delta's On Board Manual, coffee "[b]rewing will occur only when the water is within the set maximum nominal operating range of approximately 188°F to 196°F (86°C to 91°C)." (**Exhibit E:** OBM, DELTA000111)

7.      There is no evidence regarding which of the several coffee makers brewed the coffee served to Plaintiff. Regardless, there are no records or other evidence showing that any of the on-board coffee makers experienced any maintenance issues, mechanical failures, or other malfunctions, either before or after the flight. Specifically, there is no evidence that any of the coffee makers on Flight

DL276 were operating abnormally such that coffee was brewed at a hotter temperature. Additionally, there is no evidence that Delta's flight attendants or any other personnel increased the factory pre-set brewing temperature on any of the coffee makers, or that Delta was even capable of increasing the factory pre-set brewing temperature.

8.      After coffee is brewed, Delta's service standards dictate that the flight attendants deliver the coffee and other food and beverages "simultaneously in both aisles, from carts, FWD to AFT": i.e., from the front to the back of the aircraft. (**Exhibit F:** International Main Cabin Service Standards, DELTA000121; **Ex. A** at 46:25-47:2)

9.      Thus, pursuant to Delta's standards, the flight attendants on Plaintiff's flight: brewed coffee in a coffee maker located in one of the galleys, which was set to brew with water between 188°F - 196°F; served the coffee to passengers from service carts; first served passengers in the forwardmost coach-class row, row 20; and continued to serve passengers row-to-row as they pushed the cart toward the back of the aircraft.

10.      Consistent with Delta's service standards, the flight attendants did not come to Plaintiff's row right away. (**Ex. A** at 40:19-22) Instead, it took some time for the flight attendants to push the service cart from row 20 to Plaintiff in row 44. (*Id*. at 41:4-7) In fact, Plaintiff testified that it took the flight attendants between 5-

3

10 minutes just to move the service cart from row 42 to row 44, where Plaintiff was seated. (*Id*. at 43:16-23)

11.     At the time coffee was served to Plaintiff, a sandwich, fruit, spoon, fork, and napkin were already on Plaintiff's tray table. (*Id*. at 44:17-20, 45:15) Plaintiff intended to eat her sandwich, as well as drink a cup of coffee, as is her habit when flying in the morning, (*Id*. at 37:12-14, 22-24; 38:16-18; 39:12-14; 51:16-25)

12.     Plaintiff ordered plain "coffee," not iced coffee or cold brew coffee. (*Id*. at 48:17-49:3) The flight attendant took a coffee canister or pitcher from the service cart, poured the coffee into a paper cup, and handed the cup to Plaintiff. (*Id*. at 49:4-20; 50:3-10; 52:1-3) There was nothing unusual or unexpected about the transfer of the cup from the flight attendant's hand to Plaintiff's hand, which occurred with no problems. (*Id*. at 50:9-24)

13.     The coffee was served to Plaintiff in a paper cup without a lid. (*Id*. at 52:1-5) During Plaintiff's numerous other flights with Delta, as well as other airlines, coffee was never served with a lid. (*Id*. at 17:20-19:15; 21:5-22:10; 23:24-27:21; 52:6-18) Thus, Plaintiff did not expect to get a lid with the cup of coffee served to her on the flight, nor did she ask for a lid. (*Id*. at 52:19-23)

14.     The flight attendant served Plaintiff the cup filled only ¾ with coffee, which means it was only filled to an inch below the rim of the cup. (*Id*. at 53:17-54:3)

15.     Plaintiff initially testified that she put the cup of coffee under nose and "I kind of take a, like I smell it, make sure it's not hot, too hot." (*Id*. at 55:20-21; 56:12-21; 57:8-10) Plaintiff later testified that, although she "did not drink the coffee," she "sipped it." (*Id*. at 68:4-12) Plaintiff took a sip of coffee into her mouth, and she swallowed it. (*Id*. at 131:19-22) The coffee Plaintiff consumed was not hot enough to burn her tongue or mouth. (*Id*. at 68:13-14; 68:23-69:9).

16.     Plaintiff testified that some people may like their coffee served hotter than others, and the coffee served to Plaintiff was too hot according to her personal preference. (*Id*. at 57:8-21) Based on the smell and sip, alone, Plaintiff decided that the coffee was too hot for her liking. (*Id.* at 57:8-21)

17.     Since Plaintiff determined that the coffee was too hot for her personal preference, she placed the cup in the familiar circular indentation on the tray table, where she allowed it to cool for 1-2 minutes. (*Id*. at 57:22-58:6) Plaintiff thought that, after 1-2 minutes, the coffee would have cooled. (*Id*. at 58:7-11)

18.     After the cup of coffee sat for 1-2 minutes in the indentation on the tray table, "all of a sudden, the cup tilted and then it overflow[ed] on the tray and then it went to [Plaintiff's] lap." (*Id*. at 58:18-24) **Plaintiff does not know why or what caused the cup to tip over**. (*Id*. at 80:10-20)

19.     There was nothing unusual, unexpected, or problematic with respect to the seat Plaintiff occupied or the tray table at her seat (*id*. at 33:25-34:16), and the

flight was not unusually or unexpectedly turbulent or bumpy (*id*. at 34:18-35:1). There is no evidence that any acts or omissions by any Delta crewmembers in any way caused or contributed to the cup tipping over. Likewise, there is no evidence showing that Plaintiff herself did not cause the cup to tip over.

20.    After the cup tipped, the coffee spilled onto the tray table, and then came off the front of the tray table and onto Plaintiff's lap. (*Id.* 87:23-88:8)

21.    After the cup tipped and the coffee spilled – and while still seated with her seat belt fastened and her pants wet with coffee – Plaintiff waited between 2-3 minutes before getting up and seeking the assistance of a flight attendant positioned at the aft galley. (*Id*. at 82:23-25, 83:8-17, 85:4-13, 86:4-5, 86:6-87:16, 89:11-22, 89:23-90:2)

22.    Plaintiff showed the flight attendant a burn on the thigh of her left leg. (*Id*. at 91:16-22) The flight attendant and Plaintiff went into the lavatory, and the flight attendant:

- doused Plaintiff's thigh with 4-5 gallons of cold bottled water;
- paged the cabin to ask for the assistance of a doctor;
- provided a topical ointment that was applied by a passenger who was a doctor;
- offered ibuprofen for pain, which Plaintiff accepted;
- provided Plaintiff with a row by herself in the back of the aircraft;
- checked on Plaintiff during the remainder of the flight;
- retrieved Plaintiff's carry-on baggage upon arrival at DTW;
- arranged for a wheelchair to pick up Plaintiff at the aircraft door upon arrival at DTW; and
- the wheelchair took Plaintiff through customs and to baggage claim at DTW.

6

(*Id*. at 92:21-98:8) Plaintiff is not critical of and has no complaints about the conduct of the flight attendants after the spill. (*Id*. at 98:10-99:2)

23.     There is no evidence that any other passengers complained about the coffee being unusually or unexpectedly hot, nor were any other passengers injured by the coffee served on Flight DL276.

24.     On the same day as the spill, February 9, 2020, Plaintiff was diagnosed with a second-degree burn to her left thigh. (*Id*. at 100:6-12) Plaintiff's burn was essentially healed and did not require any treatment as of February 24, 2020: i.e., only two weeks later. (*Id*. at 113:6-116:19; 122:2-12)

25.     On June 18, 2021, Plaintiff filed her Complaint against Delta in this Court. (PageID.1-19) Therein, Plaintiff alleges that Delta "prepared and served her coffee at a temperature unfit for human consumption." (PageID.5 ¶14) Additionally, Plaintiff alleges that her "second degree thermal burns from coffee are an unexpected or unusual occurrence." (PageID.5 ¶15)

26.     In her deposition, however, Plaintiff testified that she does not know what the usual or expected range of temperatures for brewing or serving coffee is. (*Id*. at 60:25-61:5) **Plaintiff also testified she does not know – and there is no way for her to know – the temperature of the coffee when it was served to her on this flight**. (*Id*. at 59:10-60:8) Additionally, Plaintiff testified as follows:

Q.    And so whether the temperature was something that was unusual
      or unexpected versus hot coffee you've had on other Delta flights
      there's no way to tell that, right?

A.    Yeah, I can't tell.

                          *        *        *

Q.    And there's no way to tell whether the temperature of the coffee
      on this flight was unusual or unexpected versus any cup of coffee
      you've had on any other airline on any other flight, right?

A.    Yeah, I can't tell the difference.

(*Id.* at 60:4-23)

27.    Furthermore, Plaintiff testified that on some occasions she will be

served food or drink that is hot enough to burn her skin; however, Plaintiff does not

know the temperatures at which hot foods or drinks are served. (*Id.* at 63:17-21;

64:7-13; 71:14-18; 77:3-8; 77:11-19) Plaintiff drinks hot coffee from McDonald's,

but she does not know the temperate at which McDonald's coffee is served, or if it

is served at a temperature hot enough to burn her skin. (*Id.* at 75:18-76:21) When

specifically asked whether it is usual for coffee to be served at a temperature hot

enough to cause a burn to human skin, Plaintiff testified, "**I don't know**." (*Id.* at

69:11-70:2) (emphasis added) Nevertheless, Plaintiff testified that she expects coffee

to be served at a low enough temperature not to burn her skin. (*Id.* at 75:11-15)

28.    Plaintiff testified that the coffee served on the subject flight was unfit

for human consumption, and usually and unexpectedly hot, because it caused a

second-degree burn:

Q.    What is your basis for testifying under oath that the coffee served
      to you during the service was unfit for human consumption?

8

A.   I have a second-degree burn.

Q.   Okay. So you think the temperature of the coffee that was served to you was too hot because it caused a burn on your leg, right?

A.   Yes.

Q.   Was the temperature of that coffee as you experienced it hotter than coffee that had been served to you on previous Delta flights?

A.   Yes.

Q.   And how do you know that?

A.   Because I had a second-degree burn.

Q.   Okay. Because you burned yourself on this flight but not on the previous flights, right?

A.   Because I did not spill from previous flight.

(*Id*. at 78:2-21)

29.     Plaintiff was not told by any doctors, or anyone else, that the coffee on the flight was unfit for human consumption. (*Id*. at 99:6-14) Plaintiff did not disclose any expert reports or testimony and cannot produce any other evidence showing that the coffee was brewed or served at an unusually or unexpectedly hot temperature.

30.     Additionally, Plaintiff cannot produce any evidence showing that her second-degree burn must have been caused by unusually or unexpectedly hot coffee.

31.     To the contrary, the only evidence regarding the range of temperatures at which coffee is usually brewed and served is provided by Delta. According to the undisputed expert report from Delta: coffee on Delta flights, which is prepared with water between 188°F - 196°F, is brewed at a temperature consistent with industry standards; and Plaintiff's coffee would have cooled between the time it was brewed and the time of the subject incident many minutes later. (**Ex. G**: Dr. Fortenbaugh's report pg. 12)

9

32.    Additionally, contrary to Plaintiff's speculative allegations and testimony, the undisputed evidence shows that "[i]t is not usual or unexpected for a second-degree burn to occur within seconds from a hot beverage served at normally accepted temperatures."  (**Ex. H**: Choucair's report pg. 1; **Ex. G**: Dr. Fortenbaugh's report pg. 12))

## STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant has the initial burden of demonstrating the absence of any dispute as to a material fact, with all inferences being made in favor of the nonmovant. *Id.* at 323. Once the movant meets its burden, the burden then shifts to the nonmovant to present specific facts showing that a genuine issue for trial exists. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the nonmovant must come forth with sufficient evidence for which a jury could reasonably find for that

party, and a mere "scintilla of evidence" is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

I.   **LIABILITY STANDARDS UNDER ARTICLE 17 OF THE MONTREAL CONVENTION**

A.   **Plaintiff's Flight on Delta Was "International Carriage" Under the Montreal Convention.**

The Montreal Convention is an international treaty that "establishes a comprehensive regime governing liability arising from international air carriage." *Avalon Techs., Inc. v. EMO-Trans, Inc*., No. 14-14731, 2015 WL 1952287, at *2 (E.D. Mich. Apr. 29, 2015) (citing Sen. Exec. Rep. No. 108-8, at 2 (2003)); *see also* Convention for the Unification of Certain Rules Relating to International Carriage by Air, opened for signature on May 18, 1999, reprinted in S. Treaty Doc. 106-45 at 27 (2000) 1999 WL 33292734 (entered into force November 4, 2003) (treaty) (**Exhibit I**). The Montreal Convention is applicable to all "international carriage" of persons performed by aircraft for reward. M.C., Art. 1(1). "International carriage" is defined as any carriage in which "the place of departure and the place of destination, whether or not there be a break in the carriage or a transshipment, are situated...within the territories of two States Parties." M.C., Art. 1(2).

Here, Plaintiff's flight was "international carriage" under Article 1(2): Plaintiff's carriage began and ended at Detroit Metropolitan Wayne County Airport, in Detroit, Michigan, with agreed stopping places in Japan and the Republic of the

Philippines. (ECF No. 1, PageID.3) The United States, Japan, and the Republic of the Philippines are all parties to the Montreal Convention. *See* https://www.icao.int/secretariat/legal/list%20of%20 parties/mtl99_en.pdf. Thus, the Montreal Convention applies and governs Plaintiff's claims against Delta.

Plaintiff concedes the exclusive application of the Montreal Convention by pleading only one claim against Delta: a "cause of action under Article 17 of the Montreal Convention." (PageID.3-6) Plaintiff does not plead any other causes of action against Delta, nor can she.

**B.    The Montreal Convention Provides the Exclusive Cause of Action for a Bodily Injury Caused by an "Accident" on an International Flight.**

Article 17 of the Montreal Convention governs an air carrier's liability for a passenger's bodily injury as follows:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

To prevail on a bodily injury claim under Article 17, a plaintiff bears the burden of establishing the occurrence of an "accident" within the meaning of the Montreal Convention. *Siddiq v. Saudi Arabian Airlines Corp.*, No. 6:11-CV-69-ORL-19GJK, 2013 WL 2152566, at *5 (M.D. Fla. Jan. 9, 2013) (citing Montreal Convention, Art. 17; *Air France v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985)).

12

Because a passenger must prove that an "accident" occurred, Article 17 of the Montreal Convention does not impose a strict liability regime. *See Furuta v. Hawaiian Airlines Inc*., No. CV 19-00617 JAO-KJM, 2022 WL 3645764, at *5 (D. Haw. Aug. 24, 2022) (citing *Saks*, 470 U.S. at 407) ("[P]arties to the Montreal Agreement…did not waive…provisions in the Convention that operate to qualify liability, such as…the 'accident' requirement of Article 17.")); *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) ("[I]n order for an airline to be liable for a passenger's injury, the injury must be caused by an "accident."); *Wallace v. Korean Air*, 214 F.3d 293, 297 (2d Cir. 2000) ("The essential predicate of carrier liability is the occurrence of an 'accident'").

An "accident," however, is not defined in Article 17 or elsewhere in the Montreal Convention. *Saks*, 470 U.S. 392 at 405-06. Instead, an "accident" under the Montreal Convention is a legal construction that means "something more than an event which fortuitously occurs on board the aircraft." *Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d 651, 665 (S.D.N.Y. 2001) ("*Fulop I*") (citing *Saks,* 470 U.S. at 403); *see also Rafailov v. El Al Israel Airlines, Ltd*., No. 06 CV 13318 (GBD), 2008 WL 2047610, at *2 (S.D.N.Y. May 13, 2008) ("Not every identifiable incident or occurrence during a flight is an accident within the meaning of Article 17 even if the incident gives rise to injury").

The Supreme Court has construed and defined an Article 17 "accident" as an injury "caused by an unexpected or unusual event or happening that is external to the passenger." *Saks*, 470 U.S. at 405 (emphasis added). Conversely, the Supreme Court has held that an Article 17 "accident" does **not** occur "where the injury results from the passenger's own internal reaction to the **usual, normal, and expected operation**" of the airline or aircraft. *Id.* at 406 (emphasis added) (resolving the issue of whether plaintiff's "injury was caused by the normal operation of the aircraft's pressurization system.").[1]

Importantly, the Montreal Convention provides the *exclusive* cause of action for injuries caused by an accident during international air transportation. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 161, 119 S. Ct. 662, 668 (1999). Thus, if a plaintiff cannot satisfy the burden of establishing an "accident" within the meaning of the Montreal Convention, then recovery "is not available at all." *Id*.; *see also Sethy v. Malev-Hungarian Airlines, Inc*., No. 98 CIV. 8722 (AGS), 2000 WL 1234660, at *4 (S.D.N.Y. Aug. 31, 2000), aff'd, 13 F. App'x 18 (2d Cir. 2001) ("Because plaintiff's alleged injury is not an "accident,"…there is no triable issue of fact...Accordingly, defendant's motion for summary judgment is granted.").

---

[1] Courts have construed an Article 17 "accident" using the same criteria whether applying the Montreal Convention or its predecessor, the Warsaw Convention. *See Cohen v. Am. Airlines*, *Inc*., 13 F.4th 240, 244 (2d Cir. 2021) (citing "substantively identical" accident provisions in the Montreal Convention and Warsaw Convention) (citing *Saks*, 470 U.S. at 405; Warsaw Convention, Ch. III, Art. 17.).

C.     **Objective Standards, Not a Passenger's Subjective Standard or Belief, Determine Whether an Event Is an Article 17 Accident.**

A plaintiff bears the burden of showing that her injury did not result from her own internal reaction to usual, normal, and expected operations. *Saks*, 470 U.S. 392, 405. Additionally, when determining whether plaintiff has established an Article 17 accident, courts do not view the evidence from plaintiff's perspective – they examine the circumstances **objectively**. *See Husain v. Olympic Airways*, 116 F. Supp. 2d 1121, 1130 (N.D. Cal. 2000), aff'd, 316 F.3d 829 (9th Cir. 2002), aff'd, 540 U.S. 644, 124 S. Ct. 1221, 157 L. Ed. 2d 1146 (2004) ("inquiry is an objective one, and does not focus on the perspective of the person experiencing the injury"); *see also Fulop I*, 175 F.Supp.2d at 665 (explaining that in *Saks* the Supreme Court required courts to view the circumstances objectively); *Moore v. Brit. Airways PLC*, 32 F.4th 110, 118-19 (1st Cir. 2022) ("By and large, courts have been unwilling to adopt a subjective test…an individual passenger's subjective beliefs do not inform the question of whether an event is unexpected and, thus, may be found to be an accident. The appropriate inquiry is an objective one.") (citations omitted); *Krys v. Lufthansa*, 119 F.3d 1515, 1521 (11th Cir. 1997) (to determine whether an event is unexpected, courts look to a "purely factual description of the events" irrespective of the passenger's subjective experience); *Dizon v. Asiana Airlines, Inc.*, 240 F. Supp. 3d 1036, 1038 (C.D. Cal. 2017) (plaintiff failed to provide any evidence, other than his own belief, that the event was "usual" or "expected"); *Gotz v. Delta Air*

15

*Lines*, 12 F. Supp. 2d at 202 (D. Mass. 1998) (subjective expectations do not control; no accident merely because plaintiff "did not expect the unexpected").

### D.   Industry Standards and Procedures Determine Usual and Expected Operations.

Courts often look "to industry standards as well as airline policies and procedures in determining whether an event was 'unexpected or unusual.'" *Sook Jung Lee v. Korean Air Lines Co.*, No. SACV 10-01709-JVS (MLGx), 2012 WL 1076269, at *5 (C.D. Cal. Mar. 21, 2012); *Fulop v. Malev Hungarian Airlines, Inc.*, 244 F. Supp. 2d 217, 220 (S.D.N.Y. 2003) ("*Fulop II*") (courts must first determine what policies and procedures govern the airlines, and then decide whether the airline violated any such applicable standards); *Fulop I*, 175 F.Supp.2d at 665 ("Any major deviation from a standard articulated in recognized practices and procedures represents the exceptional case – the unusual or unexpected happening").

"[A] plaintiff's unusual reaction to a routine and expected incident of airline travel, including any procedure that is conducted in the routine and expected manner," is not an accident within the meaning of Article 17. *Fishman by Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 143 (2d Cir. 1998). Thus, "an individual nauseated by a bumpy ride or standard airline fare," "a person squeamish about a pre-flight search," or the presence of a bag in or near the aisle during the boarding process is not an accident under Article 17. *Id.*; *Sethy*, 2000 WL 1234660, No. 98 Civ. 8722(AGS), at *4. In *Saks*, *supra*, the injurious event was not caused by "any

16

conduct of airline employees that could reasonably be deemed unusual or unexpected. Nothing happened during the otherwise ordinary flight that involved actions of anyone, except the passenger herself." *Fulop II,* 175 F. Supp. 2d at 663 (citing *Saks*); *see also Sethy,* 2000 WL 1234660, No. 98 Civ. 8722(AGS), at *4 ("plaintiff cannot point to any act or omission by the airline's crew or passengers that could have caused his alleged injury.").

### E. There Are Industry-Standard Temperature Ranges for Brewing and Serving Hot Coffee

As numerous courts have recognized, "'heat is an inherent feature of a cup of coffee' and it is expected that coffee will be served at a temperature hot enough to cause burns." *Morris v. Starbucks Corp.*, No. 1:18-CV-5034-TWT, 2019 WL 7496785, at *4 (N.D. Ga. Sept. 27, 2019) (compiling cases); *see also Holowaty v. McDonald's Corp.*, 10 F. Supp. 2d 1078, 1085 (D. Minn. 1998) ("The average consumer understands that coffee is hot, and that it will cause burns if it comes into contact with skin. The danger of burns remains apparent, even if the degree of injury is more serious than contemplated."); *McMahon v. Bunn-O-Matic Corp.*, No. 3:96-CV-538RP, 1997 WL 873829, at *11 (N.D. Ind. Nov. 10, 1997), aff'd, 150 F.3d 651 (7th Cir. 1998) ("The danger that spilled hot coffee can burn is a recognized condition…The degree of burns is irrelevant.") (citations omitted); *Greene v. Boddie-Noell Enterprises, Inc.*, 966 F. Supp. 416, 419 (W.D. Va. 1997) ("[Coffee] must be sold hot enough to be palatable to consumers, even though it is hot enough

17

to burn other parts of the body."); *Immormino v. J & M Powers, Inc*., 91 Ohio Misc. 2d 198, 203, 698 N.E.2d 516, 519 (Ohio Com. Pl. 1998) ("[T]he law should not lose sight of the commonly understood events of day-to-day life. A hot cup of tea is still a hot cup of tea…Given this constant, it seems to this court that the population of society is thoroughly aware from childhood of the dangers of a hot liquid spill.").

Additionally, numerous courts have acknowledged industry-standard temperature ranges for brewing, holding, and serving coffee. *See e.g.*, *Barnett v. Leiserv, Inc*., 968 F. Supp. 690, 693 (N.D. Ga. 1997), aff'd, 137 F.3d 1356 (11th Cir. 1998) ("The standard brewing temperature for coffee makers in the coffee service industry…ranges from 195 to 205 degrees Fahrenheit."); *Oubre v. E-Z Serve Corp*., 713 So. 2d 818, 820-21 (5th Cir. 1998) ("[T]he temperature of the water at the time [of brewing] is 195 degrees Fahrenheit, plus or minus 5 degrees…175 degrees…is the temperature determined by the coffee industry as the one at which optimum flavor is retained."); *Holowaty*, 10 F. Supp. 2d at 1081 ("The optimal temperature for brewing coffee is between 195 and 205 degrees Fahrenheit…Coffee should be held at a temperature between 175 and 185 degrees for maximum flavor…Most home coffee makers hold coffee between 170 and 190 degrees.").

Although not discussed within the context of the Montreal Convention, the foregoing cases are instructive on standard coffee temperatures, as well as proving

liability for excessively hot coffee. Consider *Morris v. Starbucks*, *supra*, where the court held that Plaintiff failed to produce,

> more than a scintilla of evidence that the coffee she received on the day of the accident exceeded the temperature at which the Defendant typically brews its coffee. Even accepting as true that the coffee was hotter than "average," a jury could not reasonably infer from that fact alone that the coffee's temperature fell outside the bounds of reasonable brewing temperatures—particularly when the Plaintiff has made no attempt to establish what the upper limit should be. The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact as to whether the coffee was served unreasonably hot. Summary judgment should be entered in the Defendant's favor on any negligence claim premised on the Plaintiff's allegation that the coffee was served unreasonably hot.

*Morris*, No. 1:18-CV-5034-TWT, 2019 WL 7496785, at *4; *see also McCroy ex rel. McCroy v. Coastal Mart, Inc.*, 207 F. Supp. 2d 1265, 1272 (D. Kan. 2002) ("[The plaintiffs] failed to present any evidence, expert or otherwise, that the temperature of the drink was actually hotter than acceptable. Instead, plaintiffs asked the jury – and the court – to assume the drink was excessively hot due solely to the fact that [plaintiff] was burned. The court declines to follow plaintiffs' *post hoc, ergo propter hoc* rationale.").

Similarly, here, Plaintiff baldly alleges that Delta "prepared and served her coffee at a temperature unfit for human consumption," and her "second degree thermal burns from coffee are an unexpected or unusual occurrence." Plaintiff, however, cannot satisfy her burden of presenting affirmative evidence to support either allegation. Thus, Plaintiff cannot satisfy her burden of proving an Article 17

"accident." Therefore, recovery "is not available at all," and Delta is entitled to summary judgment under Fed. R. Civ. P. 56. *Tseng*, 525 U.S. at 161.

## II. PLAINTIFF CANNOT PRESENT ANY AFFIRMATIVE EVIDENCE OF AN ARTICLE 17 "ACCIDENT," WHICH IS AN ESSENTIAL ELEMENT OF PLAINTIFF'S EXCLUSIVE CAUSE OF ACTION.

### A. Plaintiff Cannot Present Any Evidence Showing That the Coffee Served By Delta Was Hotter Than the Standard, Usual, and Expected Range of Temperatures for Hot Coffee.

Under the Montreal Convention, Plaintiff has the burden of showing Delta's liability for her bodily injury. Specifically, Plaintiff has the burden of establishing an "accident" within the meaning of Article 17 of the Montreal Convention. Again, an Article 17 accident does **not** occur where the injury results from the passenger's own internal reaction to **usual, normal, and expected operations** (*Saks*, 470 U.S. at 406), and any major deviation from an industry standard represents the unusual or unexpected happening: i.e., an accident (*Fulop I*, 175 F.Supp.2d at 665).

Here, despite an adequate opportunity for discovery, Plaintiff cannot present any affirmative evidence to satisfy her burden of proving an Article 17 accident. Plaintiff cannot present evidence of any standard that Delta violated, deviated from, or failed to follow. Specifically, as a matter of law, Plaintiff cannot prove by a preponderance of the evidence that Delta served coffee that was "unfit for human consumption," i.e., coffee that was unusually or unexpected hot. Additionally, as a matter of law, Plaintiff cannot prove that a second-degree burn from spilled coffee is unusual or unexpected.

### 1. Plaintiff cannot prove by a preponderance of the evidence that Delta served coffee that was unusually or unexpectedly hot.

Plaintiff alleges that Delta "prepared and served her coffee at a temperature unfit for human consumption." (PageID.5 ¶14) Thus, Plaintiff has the burden of presenting affirmative evidence showing: (1) the usual and expected range of temperatures at which coffee is prepared and served (i.e., the temperature of coffee "fit" for human consumption); and (2) the coffee prepared and served by Delta was hotter than the usual and expected range of temperatures.

Plaintiff cannot show either. Instead, the *only* relevant evidence regarding coffee temperatures shows that, at 188°F - 196°F, the "[c]offee prepared on Delta flights is brewed at a temperature consistent with industry standards." (**Ex: G**: Fortenbaugh pg. 12 no. 4) Additionally, the evidence shows that that, "[Plaintiff's] coffee would have cooled between the time it was brewed and the time of the subject incident." (**Ex: G**: Fortenbaugh pg. 12 no. 4) In fact, the evidence shows that, after the flight attendants served Plaintiff, she set the coffee on her tray table to cool for 1-2 minutes before it spilled. During those 1-2 minutes, alone, the coffee most likely cooled more than 5ºC, or over 41ºF. (*Id*. at pg. 8 fig. 2) Even if brewed at the highest temperature in the coffee maker's range, 196ºF, and even if served to Plaintiff at the actual brewing temperature, the coffee would have cooled to only 155ºF just while sitting for 1-2 minutes on Plaintiff's tray. The evidence further shows, however, that significant amounts of *additional* time elapsed: from the time the flight attendants

21

brewed the coffee in the galley, placed the coffee on the service cart, positioned the cart at the start of the coach-class cabin at row 20, systematically moved the cart from row 20 toward the back of the aircraft while serving passengers in each row, moved back 22 rows until the cart stopped at row 42 (two rows in front of Plaintiff), and spent 5-10 minutes at row 42 *alone* before moving back to row 44 where Plaintiff was seated. Thus, the evidence shows that the temperature of the coffee served to Plaintiff most likely was within – if not well below – the 140-150ºF range of preferred coffee drinking temperatures: that is, at or below the usual and expected range of temperatures.

More importantly, it is not Delta's burden to show that the coffee was brewed and served at a usual and expected temperature (although that is precisely what the evidence shows). Rather, it is Plaintiff's burden to show that the coffee was brewed and served at an ***un*usual and *un*expected** temperature. Importantly, too, Plaintiff's evidence must ***objectively*** show that the coffee was too hot, not merely too hot for Plaintiff's personal preference. Whether the coffee was too hot for Plaintiff's personal preference is totally irrelevant.

In fact, the evidence does not show anything unusual or unexpected, except the spill itself, which was precipitated by unknown cause(s). Certainly, there is no evidence showing that Delta caused or contributed to the spill. Relatedly, there is no evidence showing that the spill was *not* caused by Plaintiff herself. Because Plaintiff

does not know what caused the spill, her own conduct cannot be ruled out as the cause. That is, Plaintiff's lack of knowledge regarding the cause of the spill does not satisfy Plaintiff's burden of proving that the spill was caused by something other than herself. Thus, there is no affirmative evidence that the spill was caused by an Article 17 accident.[2] *Jacob v. Korean Air Lines Co.*, No. 12-CV-62384, 2014 WL 1584444, at *7 (S.D. Fla. Mar. 20, 2014), aff'd, 606 F. App'x 478 (11th Cir. 2015) ("Plaintiff's unsupported conclusion musters up only the speculation that but for Defendant's actions, Plaintiff 'might not have experienced' swollen legs. This is the extent of Plaintiff's argument and evidence on causation. Quite simply, it is not enough to survive summary judgment.").

### 2. Plaintiff cannot prove by a preponderance of the evidence that her second-degree burn was caused by unusually or unexpectedly hot coffee.

Plaintiff also has the burden of presenting evidence showing that her "second degree thermal burns from coffee are an unexpected or unusual occurrence." (PageID.5 ¶15) Again, Plaintiff's evidence must satisfy an objective standard, not her own subjective standard or belief. Whether Plaintiff had a personal expectation that she would never get burned by a usual cup of coffee is irrelevant. And whether Plaintiff expected that she could get burned, but not get a second-degree burn, is also irrelevant. Instead, it is objectively expected that coffee usually will be served at a

---

[2] If anything, the evidence shows that Plaintiff spilled on herself and burned herself. (**Ex. A** at 84:10-12, 22-25; 85:10-13; 86:6-9; 87:24-88:2; 99:19-100:4)

temperature hot enough to cause burns. *See Morris, et al.*, *supra* at I. E. Additionally, the relevant evidence presented by Delta shows that coffee brewed and served within the usual and expected temperature range can cause a second-degree burn within a few ***seconds***. Furthermore, the evidence shows that after the coffee spilled in her lap, Plaintiff sat in her seat for several ***minutes*** before unbuckling her seatbelt, getting out of her seat, and seeking help from a flight attendant. Contrary to Plaintiff's unfounded allegations and testimony, the unrefuted evidence shows that Plaintiff's second-degree burn, in and of itself, is usual and expected and not evidence of an Article 17 accident.

As set forth above, Plaintiff cannot produce any evidence showing that the temperature of the coffee Delta served to Plaintiff was "unfit for human consumption," was unusually or unexpectedly hot, or otherwise constitutes and accident under Article 17. Additionally, Plaintiff cannot produce any evidence showing that her second-degree burn from the coffee was unusual or unexpected or otherwise constitutes and accident under Article 17. Plaintiff cannot satisfy her burden of establishing the occurrence of an Article 17 accident, and the Montreal Convention provides the exclusive cause of action for injuries caused by an accident during international air transportation. *Tseng*, 525 U.S. at 161. Thus, recovery "is not available at all." *Id.*; *see also Sethy*, No. 98 CIV. 8722 (AGS), 2000 WL 1234660, at *4 ("Cases must be dismissed where the plaintiff cannot support its

burden of proof."). Therefore, summary judgment should be entered in favor of Delta and against Plaintiff, and Plaintiff's claims against Delta should be dismissed with prejudice.

## **CONCLUSION**

The unrefuted evidence shows that Delta served Plaintiff coffee that was not unusually or unexpectedly hot. Additionally, the unrefuted evidence shows that, when spilled, the coffee caused an expected burn to Plaintiff's skin. Plaintiff cannot present any evidence to the contrary or that her injury otherwise constitutes and Article 17 accident. For those reasons, Delta respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's claims with prejudice.

Dated: April 13, 2023                Respectfully submitted,

                                     TAFT STETTINIUS & HOLLISTER LLP

                                     By:    /s/Scott R. Torpey
                                            Scott R. Torpey (P36179)
                                            Timothy J. O'Connell (P79737)
                                     *Attorneys for Defendant Delta Air Lines, Inc.*
                                     27777 Franklin Road, Suite 2500
                                     Southfield, Michigan 48034
                                     (248) 351-3000
                                     (248) 351-3082 (fax)
                                     storpey@taftlaw.com
                                     toconnell@taftlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

<u>/s/ Katherine M. Abrignani</u>

26